Good morning. Before we begin our business, we have one of the occasional pleasant occasions in which one of our law clerks is sworn into the bar of the court. And for that purpose, I will invite Judge Schall to make a motion. SCHALL Mr. Lurie, thank you. I'm pleased to make this motion. This is, as Judge Lurie suggested, a pleasant occasion. I'm moving the admission to the bar of the court of my law clerk, Eric Jeske, and I will now officially make my motion. I move the admission of Eric C. Jeske, who is a member of the bar in good standing of the highest courts of Maryland and the District of Columbia. I have knowledge of his credentials and am satisfied that he possesses the necessary qualifications. I won't go on because I promised Judge Lurie and Judge Prost in making my motion that I wouldn't. I'll just say those are the official words that… PROST I couldn't extract that as a promise. SCHALL Those are the official words, but I would just add that I move the motion and urge that I think Eric would be an excellent addition to the bar of the court. PROST Judge Prost and I will consult. LURIE I personally have worked with Eric and Judge Schall obviously has thought deeply about this, so we will grant the motion. Will you step forward and take the oath, please, from the deputy clerk? PROST Congratulations. Welcome to the bar of the court and we know you'll be an outstanding member of the bar. Our judicial business this morning consists of five cases. The veterans case, the case from the Court of Federal Claims, the patent case and two government employee cases, both of which are being submitted on the briefs and will not be argued. The first case is Leah Robinson versus the Department of Veterans Affairs, 2012, 7045. Mr. Ebert, is it? EBERT Yes, Your Honor. LURIE Please proceed. EBERT Justices, good morning. Thank you for hearing my argument. There are three technical issues in this case which require a decision from this court, but there's an underlying context that I have to emphasize. The underlying context is that this is a 91-year-old veteran who's now living in a veteran's home, who's been seeking benefits for 65 years. He served at Guadalcanal. He was injured at Guadalcanal. But Mr. Ebert was certainly sympathetic to that and, in fact, so many people come before us to whom we're also sympathetic, but we have to apply the law and the procedure and please focus on the legalities, how he wins on the merits. Thank you, and I certainly will. I wanted the court to understand the underlying context. But the three issues are, and the first one is a big one. The first one, Mr. Robinson wins on, and that's whether his fundamental due process rights across the appeal process from the regional office to the Board of Veterans' Appeals to the Court of Veterans' Claims were violated. And clearly, the evidence shows that they were violated. Well, did the essence of your argument go to the fact that his due process rights were violated because he never received an adjudication of his 1946 Q claim? Is that the heart of what you're arguing here? No, Your Honor. That's certainly one of the most important issues, is that he never received a proper adjudication from the 1946 ratings. But also, when this case went back to the Court of Veterans' Claims in 2000, and then that's where he obtained new counsel, the process of Q started in 2005. And from 2005 to today, he has never had a fair hearing. He's never had a fair adjudication of his case. But what claim in particular of his case, because it's been going on for quite a number of years? And the underlying claim is that in 1946, he should have had the rating of 40%, which was granted to him in 1997. And in 1997, he had a surgery. They found a rotator cuff. I think we understand that. I guess I'm having difficulty. I mean, there seems to be some confusion in the record. And to your credit, I think you step up in gray and kind of acknowledge that there was some problem. Yes. Well, if that's true, I mean, the government's main argument, I think, on the 46Q claim is that you didn't perfect your appeal. You didn't file the Form 9 or whatever. If that's correct, then he didn't follow proper procedures. And why is the Veterans Administration or the Court of Veterans' Claims at fault, given his failure? And that's the perfect summation of the government's argument, the VA's argument. And Madam Justice, I assert in my brief, and particularly the reply brief and with the chronology, that there's two issues in his favor. One, that he did perfect his appeal, because the appeal that was filed on his behalf twice to the Board of Veterans' Appeals in 2005 should be construed as a Form 9. In the VA, as— No, it's the actual formal brief that was filed with the BVA, and then the letters, and then the pleading to try to get an understanding from the BVA, from the Veterans Administration, that this man is trying to appeal a decision in 2005. And you note that it looks like there's not, from at least the veteran's point, it looks like when he files his appeal in 2005, he's never, given the delay, it looks like he's never going to get a statement of the case. And in fact, while this case is at the BVA, when I filed it, the VA issues a statement of the case two years later, on 11 May 2007. But he didn't appeal then, did he? He did not appeal after 11 May 2007, because his case was already at the Board of Veterans' Appeals in 2007. And I would urge you to, I think, the due process issue, particularly on the motion for reconsideration, the facts are laid out why it should be construed, the documents submitted to the BVA, should be construed as perfecting the appeal. In 2005, before the RO, which was directed at alleged clear and unmistakable error in the 1946 decision, correct? That's exactly right. Okay, but what document can you direct us to in the appendix that shows the perfection, in your words, the perfection of an appeal of that claim? That's what we need to have. We need some hook to point to and say, okay, here's where Mr. Robinson appealed that claim. Well... With the appendix, show us the appendix. And I can't point to the appendix in the short time that I have, but my point is... Can you recall what document it would be? Yeah, there is an appeal document... Is it in the appendix? I'm not sure, it's just important that we have something that we can really get our... ...is the motion for reconsideration, because that lays out how the appeal was perfected. And I have to mull through my documents to try to find the appendix. Well, there's some... You'll notice there's a number of letters, and in particular the motion for reconsideration. Is this the document at 43 of the appendix? Request for reconsideration? No, no, your honor. No, that's to the... That's to the R.O. Yeah, that's to the R.O. in Oakland. Let's see, there's one at 50. Is it argument for reconsideration? Yes. But that's before the Court of Veterans Appeals. No, there's an argument, there's the reconsideration motion before... Mr. Abert, isn't this basically a race judicata case arising from a failure of Q? He wanted an earlier effective filing date, and he took it up to the Court of Veterans Claims, Court of Appeals for Veterans Claims, which affirmed the denial, and everything after that is race judicata. And, your honor, that is the government's argument. So, if the court... But why is it wrong? Well, it's wrong because he filed his... The BVA and the VA, certainly, they have a duty to assist veterans. We know that. It's a statutory. And his appeal started in 2005, but the R.O., the BVA, and the Court of Veterans Claims construed the issue as referring back to his appeal in 2000. And so, there's like total confusion. I agree with you, Mr. Abert. I mean, there is some confusion. But, kind of the side point for me is that I think maybe some of the confusion was that it doesn't appear to me that, with regard to your Q claim of the 1946 decision, that you ever said anything about that. I mean, you know the burden is pretty high with establishing a Q claim. And all I could find, so tell me if I'm wrong, is that you made an assertion that they used the wrong standards or whatever. But, I'm not sure part of the reason some of this didn't get lost was because you really have... Have you raised anything beyond a bold, fair statement that they used the wrong standards to kind of substantiate your Q claim for 1946? Well, the answer to that is yes. I mean, I would refer you to particularly the motion for reconsideration. And, here's... Well, what did you say? I mean, did you lay out details? I mean, the Form 9, which you agree you never filled out, has a pretty large paragraph, blank, why you think the VA decided your case incorrectly. I mean, presumably if you had filed that, you would have had... Which you acknowledge you didn't. You would have had to lay out the basis for your Q claim. And I went through all the documents, and at least I didn't see anything other than a bare assertion they followed the wrong procedure, they looked at the wrong data. But no detail on that. Yes, there isn't the kind of detail that you are saying, you know, might appear in a Form 9. Yet, it's been common practice that one can take and use alternate forms and pleading instead of the Form 9. And, frankly, what a strategy and tactic that lawyers use, such as me, is to get the appeal founded and perfected at the BVA so that there can be an evidentiary hearing. And then at the evidentiary hearing, that's typically when there will be hours of testimony and law regarding this. I tell you, Bert, you wanted to save some time for rebuttal. I did. Why don't you save the rest of it, and we'll hear from the Governor. All right, thanks. Thank you. May I please, Court? I think we indicated in our brief service, May 2007 is the key month in the process, excuse me, the queue process, in which a statement of the case is issued on May 11th, and then you're coming from the RO, but there's no response to that statement of the case, which there needs to be in order to perfect the appeal. But he filed these letters. Yes. I mean, he made clear his disagreement, did he not, to whatever officials, either at the RO or at the BVA, that he really wanted to pursue this queue claim from 1946, right? I agree with everything up to the last paragraph with respect to those letters, Your Honor, because it's not clear from those letters that it was at that time, the 1946 queue claim, he was taking issue with, because he was sending the letters directly to the Board, and in the letters he characterizes a long-standing queue motion pending before you. And there hadn't been any long-standing queue motion pending before the Board at that point. There was an RO decision, which had received an NOD on the 1946 queue claim, which as the Court knows, the Board doesn't know anything about that until there's a perfection of the appeal at the RO level, which then the case gets certified and sent to the Board. So when the Board tries to react to these letters that it was receiving on a weekly basis, they looked at their documents and said, well, the only Board decision, the latest Mr. Robinson was this 2000 Board decision on an earlier aspect of the case. So they sent the letter on May 17th saying, we are interpreting these letters as requesting a queue motion on that Board decision. That's the only thing we know of that exists. And so the problem here was that— But he responded. Didn't he respond? No. No, that's wrong. I mean, didn't he file a motion for reconsideration saying, no, no, no, no, what happened to my 1946 queue claim? After the decision came down, he filed motions with the Vectors Court. I'm not sure if he filed a motion with the Board of Vectors Appeals. Let me ask, if we affirm, can he go and file tomorrow a queue claim on the 1995 decision? On the 19—on the 2005 decision? Isn't there a 1995 Board decision? Oh, Board of Vectors Appeals, the 1991 decision. I think that eventually is what gets wrapped up in the 2000 Board decision, which the Vectors Court reviewed in 2003. So, no. Well, could he file a claim, I mean, I guess, 1947 decision, 1948 decision, because he was getting all these decisions— I'm glad you asked that question, Your Honor, so I was going to think about bringing it up independently, but in—yes. And he received six RO decisions between April of 46 and May of 50. He appears—and I can't make any representations about how the Secretary would treat this, but it does appear that the one that's been at issue throughout is this April 46 decision. So, given this Court's decisions with respect to RO-level queue challenges in Andre and Andrews, I would suspect that he might at least procedurally be able to bring challenges to any of these other five RO decisions. Now, as we noted in our brief, the nature of this challenge seems to be that the facts weren't necessarily— and many of these RO decisions were supported by independent medical examinations at the time, so it'll be an uphill battle, but I think procedurally— No, I appreciate that. I think procedurally he might have a vehicle to do that, but I think here what we have— And that's essentially what he's seeking here, except, I mean, he wants it done on an expedited basis. I don't know under what authority we would have, even if we granted it, to do that. Yes, I don't think that procedurally he has an avenue available to try to reopen any of these actions that took place in 2005 and afterwards, because those windows are closed. As I said, the key month was May 07. He had the two letters, one from the Board and one from the RO. Yes, but do you understand his claim today to be principally, I want a day in court with respect to my queue claim on 1946? Yes. So what you're sort of tentatively agreeing with me is that he can get that by filing— he might lose a year if he were somehow to prevail at the end of the day. Yes, I think— That he can pursue that. I think that theoretically that is a possibility. Again, procedurally, given what Andre and Andrew say, and what I believe the 2004 decision in Veterans Courts, the decision in 2003, I think they focused—I'm pretty sure they focused on that 1946 decision. So— But that's a decision for him to make, to file, not a decision for us to make. No, that's just a sort of— And what's the answer here? The answer here— Res judicata? It's either dismissal, as he's arguing, the application of the rule of law, res judicata, or the application of the regulation that the VA or the Veterans Court applied in this case, 20.14.B, which refers to— You can't challenge a board decision for two once the Veterans Court's already reviewed it. So that was— Those are the two sort of bases for the Veterans Court's decision in this case. To the extent that the court construes this challenge here in the application, it would be a dismissal. If the court construes either as challenging the interpretation, which we don't think there's any error in, it would simply be an affirmance on the legal interpretation, if you will, of 20.14.B, which plainly provides that you can't review a board decision once the Veterans Court has reviewed it for two and the other, which has failed to perfect your decision, so you can't renew it, and that would be a sort of res judicata, as I argue. Is there an alternative? Is the only way to perfect an appeal to file Form 9, or are there other ways to do it, write a letter? I mean, does that adhere to strictly the Form 9? No. Well, you have to file a substantive appeal document, but it doesn't have to be the standard form document, so that many times the board and RO have construed documents to be the equivalent of Form 1.9, but you have to express the disagreement with the case subsequent to the issuance of the statement of the case. You know, the NOD requires the agency to re-review the case. If they determine to grant benefits, they will. If they determine to continue to denial the benefits, which is another re-judication, then they're required under regulation to issue the statement of the case from 1927 to 1926, I can't remember which. Then, upon issuance of the statement of the case, which is supposed to be the fuller development of the rationale for the RO, then it's up to the veteran to determine whether he wants to go forward. Perhaps he's satisfied and now he understands why it was denied, but if he's not, he needs to file something. It doesn't have to be on the VA Form 9 paper, although that is always attached to the statement of the case, so typically that is what's used, but as long as you provide some expression of disagreement, and there are some requirements about detail, but I think in a case where there's a single issue like this court held in Rivera, simply the disagreement might be sufficient. Here, unfortunately, despite a reference in the grave brief to a May 18th document which we were unable to find in the record, there was no filing in response to the May 11th and May 17th documents. What are the two cases? You mentioned Andre and what was the other case you mentioned? I mentioned Andre and Andrews, which are cases which deal with… Andrews? Yeah, which are in contrast to Hilliard, which is a more recent decision of this court. The issue in Hilliard was a subsequent multiple Q motions on a board decision. There's a regulation that prohibits that on a board decision. When you're challenging a board decision for Q, you're supposed to bring all your challenges in one basket, so to speak. In Hilliard, this court affirmed that regulation as being valid, but in Andrews and Andre, which preceded Hilliard in dealing with R.O. decisions, R.O. decisions, as long as they're not race judicata, I mean race judicata principles apply, so you can't challenge the same R.O. decision on the same ground, but you could challenge a… I mean, in fact, if you had a different type of challenge to the 1946 R.O., well, actually, no, because I think that was not perfect, so you might have a race judicata problem there. But in Andrews and Andre, essentially, you're allowed to file multiple R.O. challenges to individual… or Q challenges to individual R.O.s as long as they haven't subsequently been reviewed by the court. In this case, you're not even maybe even getting to that, now that I think about it, in the sense that it's a classic… he's appealing an entirely different R.O. decision. So Andrews and Andre would be guidance for this court, but I'm not even sure it's necessary to follow those. So then what you're saying is at least the 1947 to 1950 decisions would be open? I would say that it appears on the record before us at this moment that they should be open. Are there any questions? Thank you, Mr. Hawking. Mr. Ebert has a couple of minutes for rebuttal. Thank you. The government just admitted that documents other than the VA Form 9 can be construed as an appeal before the BVA. I ask you to look at the documents that were at the BVA on this statement of the case. It issued 11 May 2007. The documents before the BVA clearly show that Mr. Robinson is appealing the decision from the R.O. And note that there's a two-year delay between the filing, the notice of disagreement, and the statement of the case. And what has happened in the world out there, particularly the R.O. office in Oakland, which is the busiest office in the United States, claims to take years. And so I do not believe, I know that the issue, the legal issue this court is considering is whether there was a restituted cut. And I believe that the due process rights of Mr. Robinson, as you said, Judge Gross, to have his day in court greatly overcome the restituted cut argument because of the unique facts and circumstances of this case. And lastly, this is a 91-year-old veteran who served at Guadalcanal, was injured, and he's been attempting to obtain justice and have his day in court. And you are the only people who can give him his day in court because if this goes back, it will literally take years and years before anything happens. And so I ask you to consider the constitutional due process issues and that litany of cases that are in due process to grant justice for this man. Thank you. Thank you, Mr. Liebrecht. We'll take the case under advisement.